## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BALTNAV SINGAPORE, PTE. LTD. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| ACCESS WORLD LOGISTICS (SINGAPORE), ) | |
| PTE. LTD. ) | **ADMIRALTY RULE 9(h)** |
| ) | **VERIFIED COMPLAINT** |
| ) | |
| Defendant. ) | |

### VERIFIED COMPLAINT

Plaintiff Baltnav Singapore, Pte. Ltd. ("**BALTNAV SINGAPORE**" or "**Plaintiff**") files

this Verified Complaint against Defendant Access World Logistics (Singapore), Pte. Ltd. ("**AWS**"

or "**Defendant**") and alleges on knowledge as to its own acts and upon information and belief as

to AWS and third parties as follows:

### SUBJECT MATTER JURISDICTION AND VENUE

1.     This is an admiralty or maritime claim within the meaning of Federal Rule of Civil

Procedure 9(h) and 28 U.S.C. § 1333.

2.     Venue is proper in this District because Defendant's property is or soon will be in

this District.

### PARTIES

3.     BALTNAV SINGAPORE is a foreign business entity organized and existing under

the laws of Singapore with a principal place of business at 209 South Bridge Road, 3rd level,

Singapore 058758. At all relevant times referred to herein, BALTNAV SINGAPORE was the

disponent owner of the MV CRIMSON MAJESTY (IMO No. 9660059) (the "Vessel").

4.     Upon information and belief, AWS is a business entity organized under the laws of Singapore with a principal place of business at 1 PayaLebar Link #06-01 PLQ1, Paya Lebar Quarter, Singapore 408533. At all relevant times referred to herein, AWS was the voyage charterer of the Vessel.

## FACTS

### I.     The Charterparty

5.     By a recap dated March 24, 2022 (the "Recap"), BALTNAV SINGAPORE agreed to let and AWS agreed to hire the Vessel for a voyage from one safe berth Port Kelang (West Port, Malaysia) to another safe berth Rotterdam, The Netherlands (the "Charterparty"). Attached hereto and made a part hereof as Exhibit 1 is a true and correct copy of the recap. The Charterparty incorporated an amended Gencon 94 form, which is attached hereto as Exhibit 2.

6.     The voyage provided for by the Charterparty was the carriage of between 33,000 MT and 38,000 MT (at Owners' option) of aluminum ingots in bundles (the "Cargo").

7.     The Charterparty further provides:

Box 14

95 percent freight to be paid within 3 banking days after signing / releasing clean on board Bills of lading [...] Finalization of accounts is to be settled between Owners and Charterers within 30 days after completion of discharge and presentation of final freight account including demurrage and presentation of final support copies of the Notice of Readiness and Statement of Facts and all other relevant supporting documents.

Box 20

Demurrage rate and manner payable (loading and discharging) (Cl. 7) US$ 37,000 per day / pro rata, half despatch.

Clause 2 "Owners' Responsibility Clause"

The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager. And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

Hague Visby Rules to apply, which to take precedence in event of conflict.

Rider Clause 6

(a) Separate laytime for loading and discharging

   [...]

(c) Commencement of laytime (loading and discharging)

If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading / discharging berth shall not count as laytime or demurrage if the vessel is already on demurrage. If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime or demurrage if the vessel is already on demurrage.

Shifting from the anchorage to all fast alongside the loading / discharging berth does not count as laytime or time on demurrage.
Notice of Readiness not to be tendered prior to commencement of lay days unless Owners have obtained Charterers prior approval.
Slings and pre-slinging for key openings for Charterers' time and account.
Only certified dunnage to be used.

Rider Clause 7

3

Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day an shall be payable upon receipt of the Owners' invoice. In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

Clause 18 of the Recap provides:

- CARGO TO BE STOWED IN ALL HOLDS, BUT ALWAYS AS PER STEVEDORES AND SHIPPERS SAFETY REGULATIONS WITH NO TIER Limitation, add "cargo always to be loading in accordance with the latest IMO/IMSBC CODE Regulations"

- FREIGHT: USD 132.00 PWMT FIOT LASHED AND SECURED, LASHING, SECURING AND DUNNAGING FOR CHARTERERS ACCOUNT

The following stipulations in the Recap are reflected in the Gencon Form:

- Cargo to be stowed in all holds, but always as per stevedores and shippers safety regulations with no tier limitation. Cargo always to be loaded in accordance with the latest IMO /IMSBC Code regulations. Deck Carriage is not permitted

- US$ 132.00 per metric ton free in / out, stowed, lashed and secured. Lashing, securing and dunnaging is for Charterers' account.

Clause 5 Loading/Discharging

(a) Costs/Risks

The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.

Clause 19 "Law and Arbitration"

(a) This Charter Party shall be governed by and constructed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provision of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitration Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. [...]

**II. Facts giving rise to the Maritime Claim**

8.     The dispute is for unpaid demurrage. Based on correspondence to date, our understanding is that AWS denies liability for demurrage on the basis that the delays were caused by BALTNAV SINGAPORE'S actions during the loading of the Cargo.

9.     The Vessel tendered its notice of readiness at 10:00 on May 10, 2022, at Johor, Malaysia. Laytime commenced at 15:30 that day and Cargo loading commenced at 16:15. Cargo loading completed at 06:00 on May 16, 2022.

10.     AWS has not provided any material that discloses any complaints regarding the loading of Cargo at Johor.

11.     The Vessel sailed from Johor and called at the port of Singapore for further Cargo loading. The Vessel tendered its notice of readiness at 11:54 on May 16, 2022, and laytime commenced accordingly. Cargo loading commenced at 09:30 on May 25, 2022 and continued until 12:00 on July 4, 2022.

12.     On, or about, July 1, 2022:

a) AWS issued a letter of protest with BALTNAV SINGAPORE to pass on to the owners of the Vessel, from whom BALTNAV SINGAPORE had chartered the Vessel (the Vessel owners are not a party to this action). The covering email to

5

the letter of protest stated the following: "Urgently need to make sure that sows flipping stops and continue the conversation on the demurrage."

b) the Master lodged a letter of protest which stated:

Stevedores supervisor appointed by the charters is conducting the loading as per his experience and reducing the broken stowage between the cargo either by filling dunnage or by placing the cargo in such a manner that cargo will be compact at all time. Every unit/bundle/brand of cargo has different size and weight. Due to different size steverdores tried to make even surface for next tier loading by using either dunnage or by placing the cargo in such a way that cargo will be compact and reducing the dunnage chocking work.

c) Head Owners arranged for a P&I surveyor to attend on board to carry out an investigation on alleged delays due to unreasonable requirements of stowage of Cargo. The P&I surveyor found that:

- While loading and choking was carried out, the ship's duty officers, and crew inspected the choking and recommended additional choking where necessary.

- The overturn of sows were standard stowage by the stevedores to reduce broken stowage and usage of dunnage and were found to be appropriate.

- No unnecessary stoppages or delays due to vessel. The daily loading quantity was about 900 MT/Day.

- Holds 1, 3, and 5 were inspected and the necessary choking and dunnaging were appropriately applied at the sides, corrugated bulkheads, and uneven stowage.

- There were an average of 2 gangs engaged daily, which the P&I surveyor understood to have been supplied by the port and due to shortage of

6

manpower the port was not able to supply more than two gangs to assist in
loading the cargo.

- Based on the P&I surveyor's attendance interviews and inspections of the
  stowage in the cargo holds, it was determined that the loading operation
  process was slow due to lack of stevedores and chocking gangs provided
  daily. The loading process could have been faster if more gangs were
  engaged subject to the availability of manpower supplied by the port.

- The P&I surveyor further found that the turning around of individual sows
  was necessary to compact the stowage and reduce broken stowage. The
  stowage and chocking appeared appropriate and necessary in order not to
  cause the cargo to shift during the voyage and damage the cargo holds during
  the voyage from Singapore to Rotterdam.

13.   On July 2, 2022, the Master filed a "**Master's Report**" which stated:

Instructions were given during pre-meeting that cargo to be loaded in
aftward ship direction and dunnage to be placed in tank top and ship side to
prevent metal to metal contact. Under the guidance of Master and Chief
Officer, duty officer is regularly supervising the safe loading/handling and
chocking of broken stowage of cargo so that cargo should not shift at latter
stage.

Loading and stowing of cargo is completely under the supervision of
stevedore's foreman, they are loading the cargo by using past experience
and to fill up the broken stowage either by dunnage or by placing the cargo
in such a way so that cargo will be compact throughout the voyage. As per
foreman this is the standard practice for this type of cargo due to different
size and shape to make it even surface for next tier and forklift to be used
in each tier of the cargo.

14.   In subsequent correspondence, AWS complained that the Master and Chief Officer,
acting on behalf of BALTNAV SINGAPORE, interfered in the loading and stowage of Cargo and
directed that "excessive" quantities of dunnage be used. AWS sought to support these allegations

7

with a statement from stevedores (Hoy San) dated July 22, 2022 ("Hoy San statement"). Relevantly, the Hoy San Statement alleged that:

- The Chief Officer and crew were very involved in the orientation and method for how the Cargo should be stacked.

- The Chief Officer and crews ordered a comprehensive choking especially on holds 1 and 5 to protect the "ship wall" and also to cover all visible holes to prevent cargo shifting.

- There were discussions between the Chief Officer on site and the choking gang and stevedore in charge as to whether the requirements could be toned down yet maintaining safety, but that these proposals were rejected.

- That there were a few occasions where the choking had to be further reinforced or stacking of cargo to be redone to the satisfaction of the Chief Officer.

- That the choking requirement and flipping of the cargo were done under their instructions.

- That the total dunnages used for the Vessel was almost three times the quantity used on similar vessels worked on in the past.

15.    The owners of the Vessel (who are not a party to the dispute) have maintained the position in correspondence dated July 22, 2022 that:

- The method for loading and stowage was proposed by, and executed by the stevedores;

- The delay at the port is properly attributable to a lack of manpower due to outbreaks of COVID-19; and

8

16.     Even though the Vessels' duty officers did direct that additional dunnage be used, such directions were appropriate and necessary to prevent cargo shifting and damaging the cargo holds during the voyage.

17.     The Vessel tendered its notice of readiness in Rotterdam on August 9, 2022, at 00:42. Laytime commenced on 9 August 2022 at 13:00 and Cargo discharging commenced on August 10, 2022, at 07:30.

**II.    Loss and Damage**

18.     On September 9, 2022, BALTNAV SINGAPORE issued its freight invoice which included demurrage of USD 1,341,918.06 for Johor and Singapore, and demurrage of USD 305,635.42 for Rotterdam, in the total amount of USD 1,647,553.48 (the "Demurrage"), which is attached hereto as Exhibit 3.

19.     On September 22, 2022, AWS objected to the demurrage calculations on the basis that the time on demurrage was accrued due to BALTNAV SINGAPORE's inappropriate intervention in the loading of the cargo. Further, AWS objected to the additional costs incurred as a result of the Master or Chief Officer allegedly requiring an "excessive" quantity of additional dunnage.

20.     On October 10, 2022, AWS made a partial payment of USD 416,665, reducing the total amount of Demurrage unpaid to USD 1,189,699.65 (the "Outstanding Demurrage"). Attached hereto as Exhibit 4.

21.     On October 12, 2022, BALTNAV SINGAPORE issued its final demand letter for payment of the outstanding Demurrage.

22.     At the time of filing of this Verified Complaint no payment for the Outstanding Demurrage has been received from AWS.

9

23.    BALTNAV SINGAPORE has accordingly suffered loss and damage in the amount of USD 1,189,699.65, together with interest and costs (which costs include attorney's fees).

**III.    Anticipated Arbitration & Attorneys' Fees**

24.    The Charterparty provides that all disputes between the parties shall be submitted for arbitration in London, with English Law to apply thereto under the Arbitration Act of 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. *Clause 19*. The Charterparty further provides that the arbitration is to be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. *Id.*

25.    In accordance with the foregoing, BALTNAV SINGAPORE intends to commence arbitration in London against AWS.

26.    BALTNAV SINGAPORE reserves all rights to seek increased security as may be needed for this anticipated proceeding. Likewise, BALTNAV SINGAPORE reserves all rights to seek and recover the full quantum of its damages, attorneys' fees, costs, interest and other expenses in arbitration in England.

## BREACH OF MARITIME CONTRACT UNDER U.S. LAW

27.    AWS breached its obligations to perform under the Charterparty by failing to make payment of the Outstanding Demurrage, despite due demand.

28.    The Charterparty is a quintessential maritime contract, as it is a voyage charterparty for vessel services.

29.    By failing to pay the amounts owed to BALTNAV SINGAPORE, AWS has thereby breached a maritime contract, giving rise to a quintessential maritime or admiralty claim.

## SUPPLEMENTAL RULE B ALLEGATIONS

30.     As set forth above pursuant to the Charterparty, the underlying merits of the dispute will be resolved by arbitration in London. BALTNAV SINGAPORE expressly reserves all its rights to arbitrate the merits of the underlying dispute.

31.     BALTNAV SINGAPORE brings this action solely to obtain *quasi in rem* jurisdiction over AWS, to secure the claims to be pursued in the London arbitration more fully described above. AWS **cannot be found in the District.**

32.     After a diligent search, as is set forth in the accompanying Declaration of Imran O. Shaukat, Esq., BAL TNA V SINGAPORE respectfully submits that A WS cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

33.     Diligent searches of the website maintained by the Maryland Secretary of State, of the internet Whitepages directory, and general internet searches via Google did not identify AWS as:

a)  Ever being registered or authorized to transact business in the State of Maryland;

b)  Being incorporated or registered in the State of Maryland;

c)  Having appointed an agent for service of process in this District; or

d)  Having any other presence in this District.

34.     Further, BALTNAV SINGAPORE is unaware of AWS having any general or managing agents in this District.

35.     Accordingly, AWS cannot be "found" within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, and BALTNAV SINGAPORE seeks an Order of Attachment against such property, tangible or intangible, of AWS as may be found within the District, up to and including the full amount claimed herein (and subject

to BALTNAV SINGAPORE's reservation of all rights to adjust that amount as may become necessary and proper).

36.     BALTNAV SINGAPORE is accordingly entitled to attach AWS's property within this District pursuant to Rule B of the Supplemental Rules of Admiralty or Maritime Claims.

**I.     The property of AWS is or will be in this District**

37.     Upon information and belief, AWS has assets within this District subject to the jurisdiction of this Court, held in the hands of one or more garnishees within the District which are believed to be or will be due and owing to AWS.

38.     Upon information and belief, the specific, known Garnishee holding assets due and owing to AWS or to be holding such assets is **ACCESS WORLD USA LLC** ("AWUSA"), located at 5107 North Point Blvd. Suite A, Edgemere, MD 21219 (although BALTNAV SINGAPORE reserves the right to amend and supplement with respect to additional Garnishees).

39.     The information upon which BALTNAV SINGAPORE has formed beliefs with respect to the two immediately preceding allegations is AWS's marketing campaign and financial statements. AWS and AWUSA market themselves as a "global network" offering "end-to-end solutions" while listing all locations including AWS and AWUSA among others. Without holding, or owing funds to, or accepting payments on behalf of its affiliates, such global connectivity seems implausible.

40.     It is common in the industry in which AWS and AWUSA operate that logistical needs across the world are required. In order to in fact offer "end-to-end solutions" its appears that

12

the Access World entities necessarily hold, owe, and/or accept property, tangible and/or intangible on behalf of each other.[1]

41.     Significantly, this practice is specifically confirmed by AWS's 2021 financial statements (the "2021 Financial Statements") which is attached hereto as Exhibit 5. Page 27 of 2021 Financial Statements has a section for "...Related Company Transactions". Under that heading, the 2021 Financial Statements read: "*Many of the company's transactions and arrangements were between members of the group... The intercompany balances are unsecured, interest-free, repayable on demand and expected to be settled in cash unless otherwise stated.*".

42.     Significant sums are ascribed in the 2021 Financial Statements to "*Sales to related companies*" (page 27) and receivables "*Due from related companies*" (page 28).

43.     Accordingly, BALTNAV SINGAPORE seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching, *inter alia*, any assets of AWS held by garnishees within the District, specifically the Garnishee identified above, for the purpose of obtaining *quasi in rem* jurisdiction over AWS and to secure BALTNAV SINGAPORE's claims, as described above.

## AS AND FOR A FIRST CAUSE OF ACTION:

### ATTACHMENT OF TANGIBLE AND/OR INTANGIBLE PROPERTY OF ACCESS WORLD SINGAPORE

44.     AWS breached its maritime contractual obligations to BALTNAV SINGAPORE.

---

[1]   Accessworld.com markets itself as: Operating a global network of port and warehouse facilities which enables worldwide logistics to be seamless and transportation "from one end of the world to the other." Further, Access World's international reach allows for first-class handling through the entirety of the supply-chain through its "seamless logistics services," as illustrated in Exhibit 6. https://www.accessworld.com/ (last visited on November 21, 2022).

45.    AWS's breach caused BALTNAV SINGAPORE to suffer damages of not less than $1,189,699.65, plus interest, costs, and attorney's fee (which are recoverable under English law).

46.    BALTNAV SINGAPORE expressly reserves all its rights to have the underlying merits of its claims resolved by arbitration in London.

47.    BALTNAV SINGAPORE brings this action to obtain *quasi in rem* jurisdiction over AWS and security for the enforcement of any resulting award and/or judgments which it may obtain against AWS.

48.    AWS cannot be found within this District, but its property is found within this District.

49.    BALTNAV SINGAPORE is accordingly entitled to attach AWS's property within this District.

50.    BALTNAV SINGAPORE seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplement Rule B, attaching any and all assets of AWS up to the amount of $1,189,699.65, plus interest, costs and attorney's fees, for the purpose of obtaining *quasi in rem* jurisdiction over AWS and to secure BALTNAV SINGAPORE claims, as described above.

WHEREOFRE, Plaintiff prays for the following:

A. That process in due form of law issue against AWS citing it to appear and answer under oath all singular matters alleged in this Verified Complaint, failing which default judgment be entered against it in the sum $1,189,699.65, plus interest, costs and attorneys' fees;

B. That since AWS cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court issue an Order directing the Clerk of Court to issue Process of

14

Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all property, tangible or intangible, in whatever form, in the amount of $1,189,699.65, plus interest, costs and attorney's fees, belonging to, due or being transferred to, from or for the benefit of AWS, moving through, or within the possession, custody or control of garnishees to be named, and specifically the Garnishee identified hereinto, to establish *quasi in rem* jurisdiction over AWS and to secure BALTNAV SINGAPORE's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Rules B and E, answer the matters alleged in this Verified Complaint.

C. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D. That this Court recognize and confirm any award or judgment(s) rendered on the claims against AWS set forth herein as a judgment of this Court;

E. That this Court award BALTNAV SINGAPORE the attorney's fees and costs incurred in this action; and

F. For such other and further relief as the Court deems just and proper.

Dated: December 1, 2022

<div align="center">

**SEMMES, BOWEN & SEMMES**

</div>

By: */s/ Imran O. Shaukat*
James W. Bartlett, III (00017)
Imran O. Shaukat  (30134)
25 South Charles Street, Suite 1400
Baltimore, Maryland 21201
Tel.:        (410) 539-5040
Fax:        (410) 539-5223
Email:      jbartlett@semmes.com

15

ishaukat@semmes.com

Attorneys for Plaintiff
BALTNAV SINGAPORE, PTE. LTD.

Luke F. Zadkovich
Mozar C. Ross
**Zeiler Floyd Zadkovich (US) LLP**
33 East 33rd Street, Suite 905
New York, NY 10016
luke.zadkovich@zeilerfloydzad.com
mozar.ross@zeilerfloydzad.com

Attorneys for Plaintiff
(to be admitted *pro hac vice*)

**VERIFICAITON**

Pursuant to 28 U.S.C. 1746, SEBASTIAN DEMANT declares as follows:

I am the GLOBAL HEAD OF OPERATION of Plaintiff, Baltnav Singapore, Pte. Ltd. And an authorized officer thereof. I have been so affiliated at all times referred to in the foregoing Verified Complaint. I have read the foregoing Verified Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my professional duties and my review and familiarity with correspondence and other relevant documents, including the exhibits to the foregoing Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 5TH day of December in Copenhagen.

SEBASTIAN DEMANT

