# BIMCO

# GENCON 1994
UNIFORM GENERAL CHARTER

Exhibit 2
PART I

| | | | |
|---|---|---|---|
| 1. | Shipbroker<br>**OKEE Maritime GmbH**<br>**Colonnaden 13, Hamburg / Germany** | 2. | Place and Date<br>**Hamburg, 24th March 2022** |
| 3. | Owners/Place of business (Cl. 1)<br>**Baltnav Singapore Pte Ltd**<br>**209 South Bridge Road, 3rd Level**<br>**Singapore 058758** | 4. | Charterers/Place of business (Cl. 1)<br>**Access World Logistics (Singapore) Pte Ltd**<br>**1 Paya Lebar Link · #06-01 PLQ 1 Paya Lebar Quarter ·**<br>**Singapore 408533** |
| 5. | Vessel's name (Cl. 1)<br>**TBN – please see Rider Clause 20** | 6. | GT/NT (Cl. 1)<br>**/** |
| 7. | DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. | Present position (Cl. 1) |
| 9. | Expected ready to load (abt.) (Cl. 1)<br>**1st May 2022** | | |
| 10. | Loading port or place (Cl. 1)<br>**1 safe berth Port Kelang (West Port), Malaysia**<br>**Owners to satisfy themselves and be responsible for any port / berth / anchorage restrictions / regulations including draft / airdraft and approaches at all ports / berths / anchorages.** | 11. | Discharging port or place (Cl. 1)<br>**1 safe berth Rotterdam, The Netherlands**<br>**Owners to satisfy themselves and be responsible for any port / berth / anchorage restrictions / regulations including draft / airdraft and approaches at all ports / berths / anchorages.** |
| 12. | Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>**Cargo to be loaded as a full and complete cargo with direct sailing.**<br>**Max vessel's intake Owner's declare basis draft restriction both ends a sole cargo of minimum 33,000 metric tons and maximum 38,000 metric tons in Owners' option of Aluminium ingots in bundles.**<br>**Cargo to be stowed in all holds, but always as per stevedores and shippers safety regulations with no tier limitation. Cargo always to be loaded in accordance with the latest IMO / IMSBC Code regulations. Deck Carriage is not permitted** | | |
| 13. | Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>**US$ 132.00 per metric ton free in / out, stowed, lashed and secured. Lashing, securing and dunnaging is for Charterers' account.** | 14. | Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br>**95 percent freight to be paid within 3 banking days after signing / releasing clean on board Bills of Lading marked "Freight payable as per Charter Party" or "Freight Prepaid". In case of "Freight Prepaid" Bills of Lading same to be released upon Charterers' confirmation that 100 percent freight less agreed deductions has been irrevocably remitted.**<br>**Finalization of accounts is to be settled between Owners and Charterers within 30 days after completion of discharge and presentation of final freight account including demurrage and presentation of final support copies of the Notice of Readiness and Statement of Facts and all other relevant supporting documents.** |

| | |
|---|---|
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6)<br><br>(a) Laytime for loading<br>**2,000 metric tons per weather working day of 24 consecutive hours Sundays and holidays included**<br><br>(b) Laytime for discharging<br>**2,500 metric tons per weather working day of 24 consecutive hours Friday 5 PM, Saturdays, Sundays and holidays excluded unless used (Friday 1700 hours to Monday 0800 excluded unless used)**<br><br>(c) Total laytime for loading and discharging |
| 17. Shippers/Place of business (Cl. 6) | |
| 18. Agents (loading) (Cl. 6)<br>**Ben Line Agencies**<br>Lots 2.07 - 2.08, 2nd Floor, Southwest Wing Westports Business Centre Pulau Indah,<br>42920 Port Klang Selangor Darul Ehsan, Malaysia<br>+60 331 011 636 / +60 331 011 860<br>kua.operations@benline.com.my<br>Capt Thomas Mathews Branch Manager<br>Direct   +60 33 101 1364 / Mobile  +60 12 395 2312<br>thomas.mathews@benline.com.my<br>Bala M Assistant Operations Manager<br>Direct   +60 33 101 1368 / Mobile  +60 12 383 0161<br>kua.operations@benline.com.my. | |
| 19. Agents (discharging) (Cl. 6)<br>**Noordriver Shipping BV**<br>Singel 268<br>3311 HK  Dordrecht<br>The Netherlands<br>Tel +31-78-6350750<br>Web www.noordriver.com | |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>**US$ 37,000 per day / pro rata, half despatch** | 21. Cancelling date (Cl. 9)<br>**12th May 2022**<br>**Owners to try their best to meet laycan 1st – 8th May 2022** |
| | 22. General Average to be adjusted at (Cl. 12)<br>**London, English Law to apply** |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c))<br>**Taxes/ dues/ wharfages, if any, on Vessel and / or freight to be for Owners' account all ends**<br>**Taxes/ dues/ wharfages, if any, on cargo to be for Charterers' account all ends** | 24. Brokerage commission and to whom payable (Cl. 15)<br>**3.75 percent total commission**<br>**(2.5 percent address commission plus 1.25 percent broker commission)**<br>**All commissions are payable on Freight, Deadfreight and Demurrage. Broker commission to be paid directly to brokers by Owners.** |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>**(a) English law, London arbitration (See Clause 39)**<br>(a) State maximum amount for small claims/shortened arbitration (Cl. 19)<br>**US$ 100,000** | 26. Additional clauses covering special provisions, if agreed<br>**Clauses 20 to 24 , as hereto attached, are fully incorporated into and form integral part of this Charter Party** |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

PART II
GENCON 1994 Uniform General Charter

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that: The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.
Owners to satisfy themselves as to compliance with any and all restrictions whatsoever at the loading / discharge ports, berths and/or places and warrant that the intake of the performing vessel will be within the agreed tolerance.

2. **Owners' Responsibility Clause**

   The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager. And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

   Hague Visby Rules to apply, which to take precedence in event of conflict.

3. **Deviation Clause**

   The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight**

(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.

(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.

(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally. Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. **Loading/Discharging**

(a) Costs/Risks

The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and

PART II
GENCON 1994 Uniform General Charter

protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.

(b) Cargo Handling Gear

Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.

(c) Stevedore Damage

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability. The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime

(a)* Separate laytime for loading and discharging

The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays included ~~excepted, unless used, in which event time used shall count~~. The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Friday PM, Saturdays, Sundays and holidays excepted (Friday 1700 to Monday 0800 hours excluded), unless used, in which event time used shall count.

(b)* ~~Total laytime for loading and discharging~~

~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~

(c) Commencement of laytime (loading and discharging)

~~Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.~~

~~If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/ discharging berth shall~~

PART II
GENCON 1994 Uniform General Charter

~~not count as laytime. If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime. Time used before commencement of laytime shall count.~~

If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/ discharging berth shall not count as laytime or demurrage if the vessel is already on demurrage. If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime or demurrage if the vessel is already on demurrage.

Shifting from the anchorage to all fast alongside the loading/ discharging berth does not count as laytime or time on demurrage.
Notice of Readiness not to be tendereed prior commencement of lay days unless Owners have obtained Charterers prior approval.
Slings and pre-slinging for key openings for Charterers' time and account. Only certified dunnage to be used.

*Indicate alternative (a) or (b) as agreed, in Box 16.

7. **Demurrage**

Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice. In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. **Lien Clause**

The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**

(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.

(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date. Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date. The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. **Bills of Lading**

Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, 2007 & 2016 forms Bills of Lading to be used in Owners' option, without prejudice to this Charter Party, or by

PART II
GENCON 1994 Uniform General Charter

the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

Owners undertake not to clause the Bill(s) of Lading / Mates Receipts, subject to Headowners approval and Owners / Master have the right to reject damaged / unsound cargoes and same to be replaced by Charterers.

**11. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12. General Average and New Jason Clause**

General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2). If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery."

**13. Taxes and Dues Clause**

(a) On Vessel - The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.

(b) On cargo - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.

(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the ~~Charterers'~~ Owners' account.

**14. Agency**

In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

**15. Brokerage**

A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24. In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses

PART II
GENCON 1994 Uniform General Charter

and work. In case of more voyages the amount of indemnity to be agreed.

**16.** **General Strike Clause**

(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17.** **War Risks ("Voywar 1993")**

(a) For the purpose of this Clause, the words:

(i) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed,

**PART II**
**GENCON 1994 Uniform General Charter**

that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(f) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**18.    General Ice Clause**

Port of loading

(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.

PART II
GENCON 1994 Uniform General Charter

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.

Port of discharge

(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.

(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

19. Law and Arbitration

(a)* This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

(b)* This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.

(c)* Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.

(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.

* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.

**PART II**
**GENCON 1994 Uniform General Charter**

~~** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.~~

(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of the sole arbitrator shall be binding on both Parties as if he had been appointed by agreement.

(b) Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

**Rider Clauses to the Charter Party dated 24th March 2022**
**MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

### Claus 20 – Vessel's description

Nominated vessel to be:
- maximum 20 years old
- to have minimum 4x30 mt gear
- Box shaped / semi-boxy / box-like
- double skin, steel floored
- 5 holds / hatches
- suitable to load intended cargo

Vessel to be highest classed Lloyds or equivalent, ISM Code certified, not blacklisted, fully International Group P&I covered, IACS Class, minimum 3 stars RightShip during the currency of this Charter Party.

Owners to provide detailed vessel description with nomination and pictures of the holds. Owners to nominate a vessel firm latest 14 days prior begin of laycan.

Acceptance of nominated vessel is subject to:
- receipt of fulfilled attached Charterers „Legal and Insurance Due Diligence Questionnaire"
- vessel is not owned, controlled, or operated by any person connected with Russia
- Vessel is not flying the Russian flag
- Vessel is not registered in Russia

Owners to provide following information with nomination:
- last 3 cargoes
- itinerary
- head owners
- Disponent Owner
- Technical Manager
- Commercial Manager

Restrictions for discharge port to be considered:
- maximum length over all 200 meter
- maximum beam 32 meter
- maximum 12.65 meter draft
- Boxshaped
- No obstacles / obstructions in holds
- Cargo to be handled with normal lifting gear
- Ship's gear in good working condition
- Clear and detailed stowplan (hatchlists)
- Clear and proper separation per Bill of Lading

Vessels holds to be free from any obstructions to normal grab discharging, such as centrelines and tanktop fittings including stand, ribbings, pad eyes and shoes for containers.

Shipowners to allow free use of vessel's gear throughout the loading and discharging operations.

## Rider Clauses to the Charter Party dated 24th March 2022
## MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.

In case of substitution of nominated vessel, Owners only allow to substitute once and to nominate final performing vessel with same critical specifications as the first nominated vessel, in any case not later than 5 days prior to laycan.

Nominated final performer to be subject to shippers / receivers approval declared by Charterers latest 24 working hours after presentation of final performing vessel. Nomination not to be unreasonably declined.

Contractual counterparty for this Charter Party is:
Baltnav Singapore Pte Ltd
209 South Bridge Road, 3rd level
Singapore 058758

Freight Beneficiary for this Fixture:     Baltnav Singapore Pte Ltd
Bank Details:
Danske Bank
Holmens Kanal 2
1090 København K
Denmark
Account No: ▮▮▮▮▮▮▮▮
IBAN: ▮▮▮▮▮▮▮▮▮▮▮▮

Bank details verification at Owners' / Contact person:
Shermaine Fong
Email: finance@baltnav.com / fsh@baltnav.com
Phone: +65 8298 1461

Charterers will not be responsible for any delays in freight payments if the account name and number has to be amended at a later stage from the subs lifted recap.
In case vessel arrived at discharge port, Owners will be obliged to release cargo without having received the payment.
Owners confirm they comply fully with all ISM and ISPS regulations and failing all losses, expenses and time in connection with same to be for Owners' account.

Owners Warranties:
-      Owners warrant that the vessel has not been involved in any pollution, grounding, serious casualty or collision incident during the past 12 months.

-      Owners to advise date of last port state control (PSC) inspection and warrant that any deficiencies have been closed out with the relevant PSC and the vessel was not detained by the port state control within the last 12 months.

-      Owners warrant that the vessel's current classification status (as on the date of fixing this charter) is free of any conditions of class or recommendations.

-      Owners warrant that at the time of fixing the charter, the vessel, owners, managers and disponent owners (where applicable), are free of any encumbrances and legal issues that may affect the vessel's acceptance by an oil company and/ or a charterer and/or the performance of the charter.

**Rider Clauses to the Charter Party dated 24th March 2022
MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

Upon nomination Owners to provide following certificates:
- Class Certificate
- Certificate of Registry
- Tonnage Certificate
- ISSC
- SMC
- DOC
- P+I Entry Certificate
- H+M Insurance Certificate
- Cargo Gear Certificate
- General Arrangement Plan
- Hatch Plan

### Clause 21: BIMCO Force Majeure Clause 2022

(a) Definitions - "Force Majeure" means the occurrence of an event or circumstance as defined in (b) below ("Force Majeure Event") that prevents a party from performing one or more of its contractual obligations ("the Affected Party"), provided that such party proves:

   (i) the existence of a Force Majeure Event;
   (ii) that such Force Majeure Event is beyond its reasonable control;
   (iii) that the Force Majeure Event could not reasonably have been foreseen at the time of the conclusion of the contract; and
   (iv) that the effects of the Force Majeure Event could not reasonably have been avoided or overcome by the Affected Party.

(b) Force Majeure Events – For the purpose of this Clause the following shall be Force Majeure Events:

   (i) actual, threatened or reported war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines;
   (ii) act of piracy and/or violent robbery and/or capture/seizure; act of terrorists; act of hostility or malicious damage;
   (iii) blockade, generally imposed trade restriction, embargo;
   (iv) act of government or public authority whether lawful or unlawful, compliance with any law or governmental order, expropriation, seizure of works, requisition, nationalisation;
   (v) plague, epidemic, pandemic;
   (vi) act of God, natural disaster or extreme natural event such as earthquake, landslide, flood, or extraordinary weather condition;
   (vii) explosion; fire; destruction of equipment; destruction of port facilities; obstruction of waterways; cyber security incident; break-down of transport, communication, information system or power supply; in each case unless caused by negligence of the Affected Party;
   (viii) ionising radiation or contamination by radioactivity, chemical or biological contamination;
   (ix) general labour disturbance such as boycott, strike and lock-out,

**Rider Clauses to the Charter Party dated 24th March 2022**
**MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

occupation of factories and premises; in each case unless limited to the employees of the Affected Party or a third party engaged by it; or

(x) any other similar event or circumstance unless caused by negligence of the Affected Party.

(c) Notices and Mitigation – The Affected Party shall:

(i) give written notice of the Force Majeure without delay to the other party identifying the relevant Force Majeure Event and its anticipated effect on the performance of one or more of its contractual obligations;

(ii) exercise reasonable endeavours to minimise the effect of the Force Majeure Event upon its performance of the contract and provide any relevant information and documentation to the other party in relation to the Force Majeure and the measures taken; and

(iii) notify the other party as soon as the Force Majeure Event ceases to prevent performance of its contractual obligations.

(d) Cooperation – The parties shall cooperate to minimise the effects of the Force Majeure on performance of the contract and shall discuss in good faith alternative ways in which the contract can be performed and/or the effect of the Force Majeure can be minimised.

(e) Non-liability for breach – Neither party shall be considered in breach of contract nor liable in damages for delay in or for non-performance of one or more of its contractual obligations to the extent caused by the Force Majeure from the time a valid notice under subclause (c)(i) was given. Continuing payment obligations – Nothing in this Clause shall impact on either party's payment obligations under the contract unless those payment obligations are directly affected by the Force Majeure.

(f) Termination – Where a valid notice has been given in accordance with subclause (c)(i) above and the Force Majeure has the effect of:

(i) rendering the performance of the contract impossible, illegal or radically different from what was intended at the time of the conclusion of the contract; or

(ii) substantially affecting the performance of the contract as a whole and the duration of the Force Majeure exceeds 15 days from the time notice was given (if this space is left blank then this subclause (g)(ii) shall not apply).

either party has the right to terminate the contract by written notification within a reasonable period to the other party.

Where a party terminates under this subclause (g) both parties shall be discharged from future obligations only and neither may claim damages for the other's future non- performance. The parties must perform all obligations not affected by Force Majeure up to the date of the termination with any sums paid in advance and not earned or due being refunded,

**Rider Clauses to the Charter Party dated 24th March 2022**
**MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

save where the contract or applicable law provides otherwise. Nothing in this Clause shall impact on any separate rights of termination under this contract or at law.

### Clause 22: BIMCO Anti-Corruption Clause for Charter Parties

(a) The Parties agree that in connection with the performance of this Charter Party they shall each:

  (i) comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organisation or by any person providing services for it or on its behalf; and
  
  (ii) make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

(b) If a demand for payment, goods or any other thing of value ("Demand") is made to the Master or the Owners by any official, any contractor or sub-contractor engaged by or acting on behalf of Owners or Charterers or any other person not employed by Owners or Charterers and it appears that meeting such Demand would breach any applicable anti-corruption legislation, then the Master or the Owners shall notify the Charterers as soon as practicable and the Parties shall cooperate in taking reasonable steps to resist the Demand.

(c) If, despite taking reasonable steps, the Demand is not withdrawn, the Master or the Owners may issue a letter of protest, addressed or copied to the Charterers. If the Master or the Owners issue such a letter, then, in the absence of clear evidence to the contrary, it shall be deemed that any delay to the Vessel is the result of resisting the Demand and any time lost as a result thereof shall count as laytime or (if the Vessel is already on demurrage) as time on demurrage.

(d) If either party fails to comply with any applicable anti-corruption legislation it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

(e) Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if:

  (i) at any time the other party or any member of its organisation has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and
  
  (ii) such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

**Rider Clauses to the Charter Party dated 24th March 2022**
**MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

Any such right to terminate must be exercised without undue delay.

(f) Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organisation has committed any breach of applicable anti-corruption legislation. Breach of this Subclause shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

### Clause 23: BIMCO Sanctions Clause for Voyage Charter Parties 2020*

(a) For the purposes of this Clause:

"Sanctioned Activity" means any activity, service, carriage, trade or voyage subject to sanctions imposed by a Sanctioning Authority.

"Sanctioning Authority" means the United Nations, European Union, United Kingdom, United States of America or any other applicable competent authority or government.

"Sanctioned Party" means any persons, entities, bodies, or vessels designated by a Sanctioning Authority.

(b) Owners warrant that at the date of this Charter Party and throughout its duration they, the registered owners, bareboat charterers, intermediate disponent owners, managers, the Vessel and any substitute are not a Sanctioned Party.

(c) Charterers warrant that at the date of this Charter Party and throughout its duration they and any subcharterers, shippers, receivers and cargo interests are not a Sanctioned Party.

(d) If at any time either party is in breach of subclause (b) or (c) above then the party not in breach may terminate and/or claim damages resulting from the breach.

(e) If performance of this Charter Party involves a Sanctioned Party or a Sanctioned Activity, without prejudice to any other rights that may be available in subclause (d) above:

(i) if loading has not commenced, Owners may cancel this Charter Party; or

(ii) if the voyage or the loading has commenced, Owners may refuse to proceed and discharge any cargo already loaded at any safe port or place of their choice (including the port or place of loading) in complete fulfilment of this Charter Party,

provided always that if this Charter Party provides that loading and/or discharging is to take place within a range of ports or places that do not involve a Sanctioned Party or a Sanctioned Activity, Owners must first request Charterers to nominate an alternative port or place and may cancel the Charter Party or refuse to proceed on the voyage only if such nomination is not made within forty-eight (48) hours after the request.

**Rider Clauses to the Charter Party dated 24th March 2022**
**MV Baltnav TBN / Access World Logistics (Singapore) Pte. Ltd.**

(f) If in compliance with subclause (e) above anything is done or not done, such shall not be deemed a deviation, but shall be considered due fulfilment of this Charter Party.

(g) Charterers shall indemnify Owners against any and all claims brought by the owners of the cargo and/or the holders of bills of lading, waybills or other documents evidencing contracts of carriage and/or subcharterers against Owners by reason of Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with subclause (e) above.

(h) Charterers shall procure that this Clause shall be incorporated into all sub-charters and bills of lading, waybills or other documents evidencing contracts of carriage issued pursuant to this Charter Party.

\* This clause is not suitable for use in the container trades.